**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**
**Grand Jury Sworn in on May 3, 2018**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **: CRIMINAL NO.** |
| | **:** |
| **v.** | **: Grand Jury Original** |
| | **:** |
| | **: 18 U.S.C. § 1001(a)(1) (False** |
| | **: Statements)** |
| **GLEN OMER VIAU,** | **:** |
| | **:** |
| **Defendant.** | **:** |

_____

**<u>INDICTMENT</u>**

The Grand Jury charges that:

Unless otherwise specified, at all times material to this Indictment:

1.   Defendant GLEN OMER VIAU ("VIAU" or "Defendant VIAU") was a Canadian citizen who was employed by COMPANY 1, a United States-based company under contract to develop technology for the U.S. Navy, from in or around 1992 until in or around 2011.  At the time of his resignation in or around 2011, VIAU held the title of Chief Operating Officer.  VIAU was re-hired as President of COMPANY 1 shortly after COMPANY 1 was acquired by BEIJING COMPANY on or about September 26, 2016. As part of the integration plan for the companies, VIAU was to report directly to BEIJING COMPANY's Chief Executive Officer in the People's Republic of China ("China" or "PRC").

2.   Between in or around 1992 until in or around 2011, COMPANY 1 was  privately-held and headquartered in Houston, Texas, with a wholly owned Canadian subsidiary, called "[COMPANY 1] International Corporation."  The U.S. Navy selected COMPANY 1 as the prime

contractor for the design, construction, and testing of numerous Submarine Rescue Diving Recompression System ("SRDRS") elements. The SRDRS was designed to assist crewmembers in distressed submarines. The contract scope of work for COMPANY 1 included the Pressurized Rescue Module ("PRM") System ("PRMS") (submarine rescue vehicle "FALCON"). The PRMS, along with other elements, formed the U.S. Navy's comprehensive SRDRS Rescue Capable System ("RCS").

3.      The PRM was a tethered, remotely operated rescue vehicle ("RORV"). It contained a transfer skirt that could be used to dock the PRM with the distressed submarine. The PRMS included other elements such as an umbilical winch and a deck cradle. The PRMS could carry up to eighteen personnel rescued from a distressed submarine. COMPANY 1 initially developed the PRMS Falcon and modified it to meet U.S. Navy specifications prior to delivery to the U.S. Navy in or around 2007 or 2008. Since that time, COMPANY 1 has been involved in the ongoing support for the U.S. Navy's submarine rescue operators. Also since that time, the U.S. Navy has requested and paid COMPANY 1 for extensive technical modifications detailed on numerous technical documents. The approximate cost of these modifications has been over $1 million.

4.      BEIJING COMPANY is a company based in mainland China. COMPANY 1 was sold to BEIJING COMPANY through a structured scheme using several front companies that made it appear as if BEIJING COMPANY were acquiring a solely Canadian company. In or around September and October 2016, COMPANY 1's shares were sold to BEIJING COMPANY for $15 million USD (via a company called "[COMPANY 1] Holding Co. Ltd"). For an additional $5 million USD, BEIJING COMPANY acquired COMPANY 1's intellectual property associated with submarine rescue technology (collectively, "the Transaction").

5.      The PRC's naval force was known as the People's Liberation Army ("PLA") Navy.

6.     Canadian Commercial Corporation ("CCC") was a Canadian Government-owned enterprise that supported Canadian foreign trade.

7.     The Investment Review Division ("IRD") was a Canadian government agency that reviewed foreign investments in Canadian businesses when the investments exceeded the applicable financial thresholds.  On or about May 16, 2017, the IRD provided COMPANY 1 with an Order (the "IRD Order") that ordered the divestment by BEIJING COMPANY and the holding company of all COMPANY 1 assets.  The IRD Order stated that BEIJING COMPANY could not "access COMPANY 1's know-how, trade secrets or confidential information used to carry on the Canadian business, including its premises and electronic information and technology systems."

8.     The China State Shipbuilding Corporation ("CSSC") was owned and operated by the PRC; it built military and civilian naval vessels.

9.     PERSON 1 was a COMPANY 1 engineer rehired in 2017 by VIAU to assist BEIJING COMPANY with a SRV proposal to the PLA Navy.

10.    PERSON 2 was a COMPANY 1 mechanical engineer who assisted PERSON 1 and BEIJING COMPANY with its PLA Navy SRV proposal.

11.    PERSON 3 was a COMPANY 1 mechanical engineer and design supervisor who assisted PERSON 1 and BEIJING COMPANY with its PLA Navy SRV proposal.

12.    PERSON 4 was BEIJING COMPANY's Deputy General Manager for its "Military Business Unit."  PERSON 4's operations were based in China.

13.    PERSON 5 was a manager and/or engineer with BEIJING COMPANY.

14.    PERSON 6 apparently worked for both COMPANY 1 and BEIJING COMPANY.

**Formal Disclosures to the U.S. Department of Commerce**

15. The Bureau of Industry and Security ("BIS") is an agency within the U.S. Department of Commerce ("DOC"), charged with the development, implementation, and enforcement of export controls for commercial and military technologies.  The Office of Export Enforcement ("OEE") is an office within BIS and, among other duties, protects national security, foreign policy, and economic interests by investigating violations and violators of export control laws, including the Export Administration Regulations ("EAR").  Licensing officials at BIS provide evaluation and processing of licenses for proposed export and re-export of goods and technology from the United States.  A key factor in determining whether an export license is needed is whether the item to be exported has been designated by a specific Export Control Classification Number ("ECCN"), which would appear in the Commerce Control List ("CCL").  For national security reasons, categories on the CCL may require a license before sending the item, or the technology restricting exports to certain countries, including China.

16. COMPANY 1's PRM had an ECCN listing of 8A620.a, which required a license to any end-user in China.  License applications for 600-series products like the PRM that are intended for export to China are generally denied for national security reasons by BIS. Further, technical data associated with the PRM would fall under 8E620.a which would also require a license to be exported to any end user in China.  Technical data transfers include data transferred by email.  The failure to obtain a required license prior to an export is a violation of the EAR.  BIS has determined that a license to export the PRM technology or technical data was neither applied for nor granted.

17. BIS encourages fulsome disclosure to OEE by individuals and companies who may believe they have violated the EAR, and self-disclosure is a mitigating factor in determining what administrative sanctions OEE may seek.  15 C.F.R. § 764.5(a).  According to the Code of Federal

Regulations, parties should make an initial notification and a thorough review should be conducted afterwards of all export-related transactions where possible violations are suspected.  15 C.F.R. § 764.5(c)(3).  The regulations recommend that the review cover a period of five years prior to the date of the initial notification.  15 C.F.R. § 764.5(c)(3).  The narrative account should include a description of any mitigating circumstances.  15 C.F.R. § 764.5(c)(3)(vi).  Each party must certify that all the representations made in connection with the disclosure are true and correct to the best of that party's knowledge and belief.  15 C.F.R. § 764.5(c)(5).  This provision cross-references 15 C.F.R. § 764.2(g), which prohibits the making of a false or misleading representation, statement, or certification, or the falsifying or concealing of any material fact to BIS in the course of an investigation or other action subject to the EAR.  Voluntary disclosures are made to the Director of OEE, which is located in Washington, D.C.

## <u>COUNT ONE</u>

**(Scheme to Falsify, Conceal, and Cover up Material Facts from the Department of Commerce's Office of Export Enforcement)**

18. The allegations set forth in paragraphs one through 17 of this Indictment are incorporated herein by reference as if fully stated herein.

19. From in or around October 2016 to in or around March 2018, in the District of Columbia and elsewhere, in a matter within the jurisdiction of the Executive Branch of the government of the United States, Defendant VIAU knowingly and willfully falsified, concealed, and covered up by a trick, scheme, and device a material fact, in that Defendant VIAU intended to and did misrepresent and conceal, to and from OEE, the true nature and extent of the transfer of U.S. Navy PRM technical data to China.

## PURPOSE OF THE SCHEME

20.  It was a purpose of the scheme for Defendant VIAU to conceal from OEE information concerning VIAU's and COMPANY 1's provision of U.S. Navy PRM technical data to BEIJING COMPANY in China to be used in a proposal for the PLA Navy, in order to avoid further U.S. Government scrutiny of COMPANY 1 and VIAU's actions, to permit VIAU and COMPANY 1 to gain U.S. Department of Defense contracts, as well as to profit on work for the PLA Navy.

## MANNER AND MEANS

21.  The manner and means included the following:

22.  Defendant VIAU represented to the U.S. Navy that, despite the sale of COMPANY 1 to BEIJING COMPANY, COMPANY 1 would "abid[e] with all export licenses," "continue to operate as an independent company," and protect U.S. Navy information.

23.  After making the representations in paragraph 22, Defendant VIAU, while in China, requested and received access to COMPANY 1's electronic files related to the U.S. Navy PRM system.

24.  Also after making the representations in paragraph 22, Defendant VIAU presented to BEIJING COMPANY a strategy for the "Chinese RORV Project" that offered to provide detailed information about COMPANY 1's work for the U.S. Navy.  Defendant VIAU later represented to BEIJING COMPANY that the estimated cost of building each RORV was approximately $20.5 million USD.

25.  Also after making the representations in paragraph 22, Defendant VIAU did in fact send, and cause to be sent, export-restricted U.S. Navy PRM technical data to China.

26.  Only after the Canadian government ordered that BEIJING COMPANY divest itself of COMPANY 1's assets did Defendant VIAU notify OEE, via an Initial Notification, that

COMPANY 1 had transferred a hard drive containing U.S. Navy PRM technical data (the "Hard Drive") to a Chinese national, who had hand-carried the Hard Drive to China.   VIAU acknowledged that this export of technical data had required a license, and claimed that COMPANY 1 was "reviewing these apparent violations."  At no time did Defendant VIAU inform OEE that VIAU himself had sent U.S. Navy PRM technical data to China, or that other COMPANY 1 employees had sent such data to be used in a PLA Navy proposal, thereby materially misleading OEE.

27.   Approximately six months after the Initial Notification, Defendant VIAU submitted to OEE what VIAU characterized as a "Voluntary Self Disclosure" (the "VSD") that purported to explain how any transfers of U.S. Navy PRM technical data had occurred and how COMPANY 1 had attempted to mitigate any compromise caused by the export violations.

28.   In the VSD, Defendant VIAU falsely stated that COMPANY 1's only export violation concerned the Hard Drive.

29.   Also in the VSD, Defendant VIAU falsely represented that BEIJING COMPANY had no use for the U.S. Navy PRM technical data and falsely maintained that COMPANY 1 and BEIJING COMPANY had complied with the Canadian government IRD Order, in order to protect VIAU and COMPANY 1 from further review by OEE, and to convince OEE that all export violations had been mitigated through the return of the Hard Drive.

## EXECUTION OF THE SCHEME

30.   In furtherance of the scheme, and to accomplish its purpose, Defendant VIAU and others known and unknown to the Grand Jury, committed or caused the following acts, among others, in the District of Columbia and elsewhere.

**A. Defendant VIAU Informed the U.S. Navy about the Sale of Company 1 to BEIJING COMPANY and Claimed that U.S. Navy Information Would Be Protected.**

31.  On or about October 5, 2016, Defendant VIAU represented to the U.S. Navy that, although COMPANY 1 was now owned by BEIJING COMPANY, COMPANY 1 would be "abiding with all export licenses."

32. On or about October 11, 2016, after learning that CCC was demanding that COMPANY 1 inform CCC and the U.S. Navy of any change in ownership of COMPANY 1 by a Chinese company, Defendant VIAU sent a notification letter to the U.S. Navy and CCC about COMPANY 1's change of ownership.

33. On or about October 11, 2017, Defendant VIAU informed the U.S. Navy that COMPANY 1 would "continue to operate as an independent company" and would "remain committed" to "our US Navy client."

34.  On or about October 12, 2016, Defendant VIAU informed U.S. Navy personnel that COMPANY 1 still maintained a security program and that there was a security plan approved by the Canadian Government so that the U.S. Navy information would be firewalled from the new Chinese ownership.  Defendant VIAU further assured U.S. Navy personnel that all COMPANY 1's employees were Canadian nationals, that Chinese nationals would not be at COMPANY 1's facility, that Chinese nationals would not be working with U.S. Navy information, and that the U.S. Navy information would be protected.

**B. While the U.S. Navy Investigated the Transaction, VIAU, COMPANY 1, and BEIJING COMPANY Created a PRMS-Based Proposal for the PLA Navy.**

35. On or about November 7, 2016, after receiving a stop-work order issued to COMPANY 1 by the U.S. Navy that expressed the U.S. Navy's concerns about Chinese ownership

of COMPANY 1, Defendant VIAU, while in China, requested, "ASAP," unrestricted remote access to files on COMPANY 1's computer server related to the U.S. Navy PRM system.

36.   On or about November 16, 2016, Defendant VIAU emailed to BEIJING COMPANY a presentation titled "[BEIJING COMPANY] BoD [Basis of Design] discussion 16 Nov 2016." The presentation suggested a strategy for an option to proceed on the RORV for China. The strategy offered to provide detailed information about the work COMPANY 1 did for the U.S. Navy project.  It further noted that BEIJING COMPANY "can work parallel path on CSSC option." It further noted that COMPANY 1 would need to apply for an export permit "to export the system design & components to China.  This will take 6-8 weeks.  Preferably we won't start this until after the US Navy contracting issue is resolved.  Perception management is important."

**C.  Defendant VIAU Sent, and Caused to Be Sent, U.S. Navy PRM Technical Data to China.**

37.   On or about November 18, 2016, in response to a request from BEIJING COMPANY for information related to COMPANY 1's work for the U.S. Navy, and to assist BEIJING COMPANY in its SRV presentation to the PLA Navy, Defendant VIAU emailed to BEIJING COMPANY management a 34-page PDF document titled "[COMPANY 1] Rescue System Experience." The subject line of the email was titled "Chinese SRV Project."  Some of the information contained in this document concerned the U.S. Navy PRM transfer skirt.  Defendant VIAU proclaimed that the attached presentation would be a good start for the upcoming discussion. Defendant VIAU, believing that he was sending information to China, further advised, "[H]ere is a [brand name file hosting service] link which will allow you to download the ppt [power point] file.  I am not sure if [brand name file hosting service] is blocked in China so I may try to send by email (14MB) as well."

38.   On or about November 24, 2016, PERSON 4 emailed PERSON 5 and Defendant VIAU, stating "[regarding the service for PRMS . . ., is there a contract or agreement?  If so, we need to check for reference.  You know we are struggling for Chinese SRV project and any information of PRMS would be referenced."

39.   Between on or about February 5, 2017, and on or about February 20, 2017, Defendant VIAU sent PERSON 1 to China in order to assist BEIJING COMPANY with a proposal to build an SRV for the PLA Navy.

40.   On or about February 2, 2017, Defendant VIAU emailed to PERSON 1, PERSON 2, and PERSON 3 an invitation to meet about "China Rescue System Discussion, Info Sharing."

41.   On or about February 6, 2017, PERSON 1 emailed PERSON 3, PERSON 2, and Defendant VIAU.  The subject line of the email was "Chinese System Requirements," and attached was a word document titled "Chinese Navy Requirements."  The document referred to the requirements for an RORV rescue system and requested that the recipients provide information for the proposed Chinese system in preparation for a BEIJING COMPANY presentation at the end of the month to the PLA Navy.

42.   On or about February 8, 2017, PERSON 3 sent an email to PERSON 1, PERSON 2, and Defendant VIAU.  The subject line of the email was "Chinese RORV Advantages," and attached to the email was a document containing a table comparing the surveillance systems of the U.S. Navy's PRM to the Chinese RORV.  PERSON 3 stated in the email's text, "Here is what I have so far.  PRM info is taken from drawings.  Chinese RORV info is taken from the RAN [Royal Australian Navy] proposal.  My next step is to add the specifications."

43.   On or about February 13, 2017, PERSON 1 emailed PERSON 2, PERSON 3 and Defendant VIAU the following information:

> As you know, [BEIJING COMPANY] is putting together a comprehensive document on the RORV for the Chinese Navy. The intent is to present it to the Navy next week, therefore they need time for translation, review, and consolidation. In order to complete the work on time, I need complete content for sections 4.2 to 4.8 below from Canada by COB Wednesday night Vancouver time. I need something for every section, so please scale the scope of the work so that all areas are adequately covered. I will need half of the items by COB Tuesday, and the other half by COB Wednesday. Most, if not all, of it could be developed by regurgitating requirements from the PRMS SOW and other documents…

PERSON 1 requested content related to numerous technical designs, such as, but not limited to, angles, speeds, capabilities, system life, and temperatures.

44.  On or about February 14, 2017, in response to an urgent request for resumes for COMPANY 1 experts in the SRV systems, "focused on PRMS or other SRV project experience," VIAU emailed PERSON 4, PERSON 1, PERSON 5, and PERSON 6 several resumes that included those of COMPANY 1 engineers.

45.  On or about February 15, 2017, in response to a request from BEIJING COMPANY's Deputy General Manager for the Military Business Unit, Defendant VIAU sent to BEIJING COMPANY's management, including its President, the following information:

> Attached here is a cost breakdown. For the RORV, Control Van, Umbilical Winch & Umbilical. These costs are in US dollars.
>
> These numbers are realistic but do not include any assumptions about additional costs or potential costs savings related to building or assembling the system in China.
>
> Also there are no costs included for training, installation on a vessel, operating spares, or sea trials. We would need more specifics about the project in order to estimate those items.
>
> Please let me know if you have any questions or would like additional detail. If you like we can have a [Chinese multi-purpose messaging application] call together with [PERSON 1] at 9am Beijing time.

Defendant VIAU attached to the email a spreadsheet showing that the cost estimate of building the RORV was approximately $20.5 million USD per rescue vehicle.

46.   On or about February 15, 2017, PERSON 1 told Defendant VIAU that the proposal to the PLA Navy would include U.S. Navy specifications.  PERSON 1 further informed Defendant VIAU that BEIJING COMPANY was looking to accommodate the PLA NAVY's LARS, deck cradles, and other infrastructure in convincing the PLA NAVY to buy BEIJING COMPANY's RORVs.  PERSON 1 further stated to Defendant VIAU "Will keep you up to date on how this develops.  Chinese Navy is in a meeting in the next room."  PERSON 1 further stated to Defendant VIAU and PERSON 2, as to whether BEIJING COMPANY could accommodate the PLA NAVY's existing structures for its RORVs, that

> we need some high level ICD dimensions.  Below is a list.  All of this should be readily available on PRM ICD [Interface Control Document] drawings or GA's [General Arrangement Drawings].  Their LARS and deck cradles are very big, so this may actually be a possibility.

47.   On or about February 16, 2017, in response to a request from PERSON 1, PERSON 2 emailed PERSON 1 and copied Defendant VIAU and PERSON 3. PERSON 2 attached six documents to the email.  Three of the enclosed multi-page technical drawings later were identified by the DOC as being controlled for export under ECCN 8E620.a.  Two of the three documents had a U.S. Government/U.S. Navy Distribution Statement indicating that distribution was "authorized to U.S. Government agencies only."

**D.  Defendant VIAU Provided False and Misleading Responses to Questions Posed by the U.S. Navy.**

48.   On or about February 17, 2017, VIAU emailed the U.S. Navy in response to questions posed by the U.S. Navy:

> U.S. Navy Question: What access does the now Chinese parent company or any Chinese Nationals have to [COMPANY 1] technology, IP, technical manuals/data?

> VIAU Response: [COMPANY 1] continues to operate as an independent Canadian company and release of [COMPANY 1]

technology, IP, technical manuals/data is controlled by Canadian export regulations to the extent that [COMPANY 1] products and data are subject to export controls. There are no Chinese Nationals currently employed by [COMPANY 1].

U.S. Navy Question: What access does the now Chinese parent company or any Chinese Nationals have to technology, technical manuals/data, government furnished information, U.S. Naval specifications and standards and any other documentation, information, and/or systems which were provided to [COMPANY 1] under a U.S. Government contract in the execution of its duties and responsibilities to perform?

VIAU Response: [COMPANY 1] handles data from any customer in accordance with the applicable data rights, distribution statements or confidentiality requirements. Restrictions on release apply to the parent company/shareholder just as they would to any third party. As previously noted there are no Chinese Nationals currently employed by [COMPANY] 1.  Also there have been no special security requirements associated with the US Government work that [COMPANY 1] has been involved with however [COMPANY 1] is open to putting in place additional data segregation and control procedures if the Government believes that additional measures are warranted to protect confidential information. In addition [COMPANY 1] has a Canadian Government Industrial Security program in place with a designated company security officer and associated security clearances for designated personnel. [COMPANY 1] has never been involved in U.S. Government work that requires security clearances.

U.S. Navy Question: Does [BEIJING COMPANY] have any affiliation with or do business with the PLA Navy?

VIAU Response: [BEIJING COMPANY] is not affiliated with the PLA Navy. [BEIJING COMPANY's products are dual use in the sense that they can be used on civil and military vessels. The products [BEIJING COMPANY] supplies are not sensitive from a military or defense perspective.  [BEIJING COMPANY] has never had any contract directly with the PLA Navy. It is, however, a subcontractor to ship building companies that serve the PLA Navy.

**E. BEIJING COMPANY Completed Presentation; VIAU Learned of U.S. Navy's Termination of COMPANY 1's Contracts.**

49.  On or about February 21, 2017 PERSON 1 emailed PERSON 3, Defendant VIAU, and PERSON 2 that the report and presentation for the PLA Navy was "pretty well complete," "just [needs] some polishing today by some of the [BEIJING COMPANY] team."

50.  On or about February 28, 2017, Defendant VIAU emailed PERSON 1 an invitation for a debrief on the "China Sub Rescue."

51.  On or about March 29, 2017, after learning on or about March 28, 2017, that the U.S. U.S. Navy had terminated its contracts with COMPANY 1, Defendant VIAU emailed the U.S. Navy's termination notice to PERSON 6 and BEIJING COMPANY representatives.  The notice stated:

> [COMPANY 1] has always been aware of the sensitivity of the Submarine Rescue Diving and Recompression System (SRDRS) under USML and/or CCL.  The SRDRS is controlled under the CCL 600 series. The Department of Commerce issued a formal determination that the Pressurized Rescue Module (PRM) is classified under ECCN 8A620.A.

**F. Defendant VIAU Filed Materially False and Misleading Initial Notification.**

52.  On or about September 27, 2017, after learning of the March 28, 2017 U.S. Navy termination notice, and the May 16, 2017 Canadian IRD Order requiring that BEIJING COMPANY and the holding company divest themselves of their investment in COMPANY 1's assets, Defendant VIAU, on behalf of COMPANY 1, filed the Initial Notification with OEE.

53.  In the Initial Notification, Defendant VIAU advised OEE that, on September 28, 2016, COMPANY 1 had provided the Hard Drive containing COMPANY 1 intellectual property ("IP")—including U.S. Navy PRM technical data—to a Chinese national, who then had hand-carried the Hard Drive to China.  Defendant VIAU further admitted that COMPANY 1 had

discovered that the PRMS was controlled under ECCN 8A620.a.  Defendant VIAU claimed that COMPANY 1 and BEIJING COMPANY "now understand" that the exports of U.S. Navy PRM technical data had required a license.  Defendant VIAU vowed that COMPANY 1 was "currently reviewing these apparent unintentional violations."  Defendant VIAU falsely and misleadingly stated that BEIJING COMPANY "did not have plans to use the IP stored on the hard drive for any specific purpose."

### G. Defendant VIAU Made Materially False and Misleading Statements to OEE in the VSD.

54.  On or about March 26, 2018, Defendant VIAU submitted the VSD, which disclosed violations related to the transfer of COMPANY 1's assets, including IP, to BEIJING COMPANY, as well as the export of IP (including the U.S. Navy PRM technical data) to China, which export required a license from DOC.  The VSD misleadingly disclosed information only concerning the Hard Drive and failed to disclose VIAU's own transfer of U.S. Navy PRM technical data to China.

55.  In the VSD, Defendant VIAU informed OEE that BEIJING COMPANY and COMPANY 1 had identified an unauthorized export of controlled U.S. Navy technical data as part of the transfer of IP to BEIJING COMPANY. The VSD explained that the export had taken place in Canada to a BEIJING COMPANY representative, who was a national of China. VIAU also confessed to a second physical export of that same technical data from Canada to China. Defendant VIAU admitted in the VSD that the U.S. Navy PRM technical data was designated under ECCN 8E620.

56.  Defendant VIAU, however, falsely attested that the U.S. Navy PRM technical data, along with "all other COMPANY 1 [IP]," was returned in good faith to COMPANY 1 in Canada approximately eight months after the initial export and that the technical data had "not been the subject of further reexports."

57.   Defendant VIAU also misleadingly stated to OEE that BEIJING COMPANY "develops advanced navigation and communications systems for the marine industry" and materially omitted that BEIJING COMPANY sought to enter the SRV industry and, in fact, that COMPANY 1 had assisted BEIJING COMPANY with a proposal for an SRV for the PLA Navy.

58.   Defendant VIAU specifically admitted in the VSD that, after the sale of COMPANY 1 had been completed, on September 28, 2016, COMPANY 1 had hand-delivered, in Canada, the Hard Drive containing the U.S. Navy PRM technical data to a representative of BEIJING COMPANY. Defendant VIAU further admitted that the Hard Drive was then hand-carried from Canada to China.

59.   Defendant VIAU admitted that, in the course of the Compliance Review, COMPANY 1 had determined that the Hard Drive contained technical data subject to the EAR, and that the U.S. Navy PRM technical data had been transferred to BEIJING COMPANY without authorization.  Defendant VIAU misleadingly asserted, however, that "[n]o other violations" were "identified during the course of the Compliance Review," materially omitting that he personally had participated in transfers of U.S. Navy PRM technical data to BEIJING COMPANY.

60.   Defendant VIAU further misled OEE that, during the course of the Compliance Review, BEIJING COMPANY had affirmed that the Hard Drive, which contained the U.S. Navy PRM technical data, had never been accessed or operated by or on behalf of BEIJING COMPANY, when VIAU had participated in other transfers of U.S. Navy PRM technical data to BEIJING COMPANY, which BEIJING COMPANY accessed for its proposal to the PLA Navy.

61.   In the VSD, Defendant VIAU falsely stated, "[BEIJING COMPANY] never had any independent use for [COMPANY 1's] intellectual property."  Similarly, Defendant VIAU falsely stated that, because the PRMS Falcon was delivered in 2008 to adhere to specific standards of the

U.S. Navy's Deep Submergence Unit, this delivery "render[ed] the specific design unhelpful for use in any other contexts."  Defendant VIAU falsely stated that [COMPANY 1] was accustomed to managing compliance with commodities and technology subject to relatively few trade restrictions, "as opposed to the . . . PRMS Falcon that had not been handled by the company for years."

62. In the VSD, VIAU claimed that the U.S. Navy PRM technical data was never accessed.  VIAU falsely stated that "there would have been no reason to access controlled technology . . .related to the PRMS Falcon, which was never reproduced and was delivered in 2008 to comply with the technical rescue specifications of the U.S. Navy."  VIAU further falsely claimed that BEIJING COMPANY and COMPANY 1 had "fully complied with the IRD Order."  VIAU also materially misled OEE by stating that BEIJING COMPANY had no need or motivation for the U.S. Navy PRM technical data, "[a]s a result, while the Parties transmitted and took possession of the physical Hard Drive without BIS authorization, we respectfully ask that the OEE bear in mind that the data on that Hard Drive, and particularly the data related to the . . . PRMS Falcon, was in all likelihood never accessed."   Finally, VIAU falsely claimed that BEIJING COMPANY and COMPANY 1 had fully complied with the Canadian IRD Order, which precluded BEIJING COMPANY from accessing COMPANY 1's technology.  As VIAU knew at the time of the VSD, separate from the transfer of U.S. Navy technical data to BEIJING COMPANY through the transfer of the Hard Drive, VIAU had participated in others transfers of U.S. Navy PRM technical data to BEIJING COMPANY, which incorporated the U.S. Navy PRM technical data in its proposal for an SRV for the PLA NAVY.

63.   Defendant VIAU signed the March 26, 2018 VSD, affirming as follows: "As required by 15 C.F.R. § 764.5(c)(5), I hereby certify that the foregoing representations are true and correct to the best of my knowledge and belief."

**H.  After Submitting the VSD Defendant, VIAU Solicited Business from the U.S. Navy.**

64.  On or about September 5, 2018, Defendant VIAU emailed the U.S. Navy that Defendant VIAU had reconstituted COMPANY 1, albeit focused on other businesses than submarine rescue technology, which were sold and to which COMPANY 1 "no longer [had] access to those products and designs."   Defendant VIAU claimed that the company was 100 percent Canadian owned, that "there should no longer be any impediments to doing business with the US Navy . . . .", and that "I would welcome the opportunity to work together in the future."

All in violation of Title 18, United States Code, Section 1001(a)(1).

A TRUE BILL

_____

FOREPERSON

_____
ATTORNEY FOR THE UNITED STATES IN
AND FOR THE DISTRICT OF COLUMBIA